**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00143-CV**
_____

**BOBBY PARHAM, Appellant**

**V.**

**JENNIFER PARHAM, Appellee**

**On Appeal from the 356th District Court**
**Hardin County, Texas**
**Trial Cause No. 57134**

**MEMORANDUM OPINION**

Bobby Parham sued his daughter, Jennifer Parham, for default on a promissory note. After a bench trial, the trial court entered a take-nothing judgment in favor of Jennifer. On appeal, Bobby raises two issues, arguing the trial court erred in construing the release of lien he signed as a release of the promissory note. We affirm.

## Background

In 2016, Bobby sued Jennifer and alleged that he was the owner and holder of a promissory note on which Jennifer had defaulted. Bobby alleged that Jennifer owed him $60,851 on the note, together with accrued prejudgment interest, post-judgment interest, attorney's fees, and court costs. Bobby attached a copy of the Promissory Note as an exhibit to his Original Petition.

Jennifer filed an Original Answer, in which she generally denied Bobby's allegations and asserted affirmative defenses of "release, waiver, and/or payment." Jennifer specifically alleged in her Answer that the Promissory Note was released by Bobby upon the execution of a Release of Lien dated March 20, 2014 and recorded in Hardin County. Jennifer's Answer alleged that the release of lien stated the following:

> Holder of the Note [Plaintiff] acknowledges its payment and releases the property from the liens, together with all other liens and security interests held by Holder without regard to how they were created. Holder further expressly releases any rights to establish or enforce the liens with regard to any other indebtedness.

Jennifer further alleged Bobby had executed a new General Warranty Deed, without lien, to her on the same day as the release of lien which was filed and recorded simultaneously with the Release of Lien.

In 2017, Jennifer filed a Motion for Summary Judgment alleging that the Release of Lien and the General Warranty Deed established as a matter of law that

2

the promissory note had been released. She attached a copy of the Release of Lien

and the General Warranty Deed as exhibits to the motion, as well as an affidavit. In

her affidavit, Jennifer stated as follows:

> Around mid-March 2014, Bobby Parham (father) came to Jennifer Parham (myself) at my current residence 5 Idlewild, Lumberton, we had a sit down talk (my kitchen table) about problems he was having with Barbara Parham (wife) and he needed to have some investment and banking statements mailed to my home in attempt to hide money from Barbara Parham, he continued to say he did not want to profit money off of his daughter and to make certain we had no problems losing our home if he were to pass away or divorce, he was going to sign the house over releasing the promissory note which would be my inheritance also he spoke of not wanting to take away from his grandchild by profiting off the home he sold me. We then proceeded with Hooks Title which included Bobby Parham calling the title company requesting them to draw up a new house deed with NO lien and release of lien that included releasing the promissory note, they took a message for Lester Sanford their attorney that handles the paperwork for deeds and releases, he called Bobby Parham the next day and per Bobby Parham he told Mr. Lester Sanford to draw up the new deed and release of lien. The next week we rode together to the title company and signed both forms in front of Cheryl the notary at Hooks Title with her explaining what we were signing[.] The next day I filed the legal documents through Hardin County courthouse and Bobby Parham called his homeowners insurance company and cancelled his policy thru the home.
>
> Bobby Parham has since changed his mind about giving me the home because of a family dispute.

Bobby also filed a Motion for Summary Judgment. In Bobby's Motion for Summary

Judgment, Bobby asserted that "[t]he entire basis for Jennifer's contention that the

Note was released is her misunderstanding that she believes the Note and the Release

of Lien are one [and] the same." Bobby alleged that Jennifer admitted that she had

3

not paid the Note in full, even though the release states that the "Holder of Note acknowledges payment[,]" and further that "Jennifer claims she and Bobby had a verbal agreement different than what the Release actually says." According to Bobby's motion, Jennifer sold the house a year after the Release of Lien for $160,000 and "was able to net all of the proceeds completely without any lien on the property[.]" Bobby attached exhibits to his motion, including copies of excerpts from the transcript of Jennifer's deposition, a December 15, 2015 demand letter his counsel sent to Jennifer, a copy of the promissory note, and his affidavit. In his affidavit, Bobby stated, in pertinent part:

> I am the owner and holder of the Note which provides the amount owed under the Note that Jennifer Parham does not dispute.
>
> This affidavit is based on personal knowledge. I identify the attached copy of the actual Note as being a true and correct copy of the original. The amount of the principal and interest owing on the date of default is $60,851.00. The interest rate accruing from the date of default is 3%.
>
> A Motion for Summary Judgment should be granted in my favor because there is no dispute that there is an amount owing on the Note, I am the owner and holder of the Note, Jennifer Parham signed the Note and never paid the Note in full, and the Release of Lien in question only covers the Lien and not the Note.
>
> The Release of Lien was never intended to release the Note in question.

Bobby also filed a response to Jennifer's motion for summary judgment, and Jennifer filed a reply to Bobby's response. The trial court signed an order denying Jennifer's motion for summary judgment.

4

After a bench trial, the trial court found in favor of Jennifer and entered a take-nothing judgment stating as follows, in relevant part:

> Having considered the evidence, testimony, oral arguments presented during the trial, trial submissions, and applicable law, the Court finds in favor of Defendant Jennifer Parham– namely that the alleged debt evidenced by the Note and the Promissory Note dated April 1, 2013 were released by Plaintiff Bobby Parham.

According to the record, neither party filed a request for findings of fact and conclusions of law, and none were entered by the trial court. Bobby timely appealed.

Testimony of Bobby Parham

Bobby Parham testified at trial that he bought hurricane-damaged property in Lumberton for $10,000, and sold the property to his daughter, Jennifer, for $10,000 down and a promissory note to Bobby for $65,000. According to Bobby, the property was appraised at $160,000 to $170,000. Bobby testified that under the terms of the Promissory Note, Jennifer owed him $65,000 to be paid in monthly payments for principal and interest and an additional amount for taxes on the first of each month starting April 1, 2013. A Warranty Deed with Vendor's Lien and a Promissory Note dated April 2013 for the property were admitted into evidence.

Bobby testified that one day when he was mowing the grass at home, Jennifer "come up with these couple two or three papers [and] said I needed to sign them for her to get a tax reduction on her house[,]" and that she would drive him to the notary and back home. Bobby testified that he normally must take pain medication for

5

chronic pain when he mows the grass. According to Bobby, they went to the notary at Hooks Title Company, "they laid these papers out[,]" the notary showed him where to sign on the already prepared papers, he signed, they left after less than five minutes, he did not speak to or pay the lawyer who prepared the documents, and he did not know he had signed a release of lien. A General Warranty Deed and a Release of Lien executed on March 20, 2014 were admitted into evidence. The Release of Lien references the April 1, 2013 promissory note and states the following, in pertinent part:

> Holder of the Note acknowledges its payment and releases the property from the liens, together with all other liens and security interests held by Holder without regard to how they were created. Holder further expressly releases any rights to establish or enforce the liens with regard to any other indebtedness.

An invoice from an attorney, Lester Sanford, addressed to Jennifer, and pertaining to the property for "[p]reparation of General Warranty Deed, conveying the Property from Seller to Purchaser[]" was admitted into evidence. A receipt from the county showing Jennifer recorded the General Warranty Deed and the Release of Lien was also admitted into evidence.

Bobby testified that he had never agreed to forgive the debt that Jennifer owed and never told her that the debt was forgiven or that she did not have to pay him back. According to Bobby, the Release of Lien does not state that payment had been made in full, no payments were made after the release of lien was signed, and the

6

release of lien did not say that the note is released, cancelled, or extinguished. Bobby testified that he brought the original promissory note signed by Jennifer to trial, that the original note had been in his possession the entire time, and that it does not say it has been paid in full, and it has not been destroyed, marked up, or cancelled. According to Bobby, at the time of trial Jennifer still owed "60,000-something" on the note.

Bobby's handwritten log of payments from Jennifer with notations thereon about the balance Jennifer owed on the note was admitted into evidence. According to Bobby, the log showed that Jennifer still owed $60,851 on the note. Bobby testified that after the documents were signed at Hooks Title Company, Jennifer did not make any more payments on the note and he did not talk to her about it because Jennifer was pregnant at the time and having expenses with doctor appointments and he did not want to "hound her about the note for a couple two or three months."

Bobby testified that later he found out that Jennifer had sold the house, and he called the courthouse. Someone at the courthouse told him the house was still in his name, and he could not figure out how Jennifer had sold the house. Bobby testified he called his attorney, she checked with the realtor who sold the house, and she said the release of lien was at the appraisal district. According to Bobby, the next morning he met with his attorney and the attorney showed Bobby a release of lien and asked if it was his signature and he responded, "Well, it kind of looks like it." Bobby

7

testified his attorney advised him to go to the title company and check the signature in the notary book. Bobby testified that an employee of the title company said she could not find the book, and he said he would come back the next morning. Bobby testified that when he came back the next morning, the employee told him that he would have to get an attorney and that she could not show him the notary signature book. According to Bobby, he did not confront Jennifer about the situation or discuss it with her. Bobby testified he sent Jennifer a demand letter in this case for $60,851 in December of 2015, and the demand letter was admitted into evidence.

Bobby testified that he had paid $10,000 cash for the property and that he spent at least $60,000 on improvements to the property, which is why he agreed to sell the property to Jennifer for $75,000. Documents and receipts detailing some of Bobby's expenses for improvements were admitted into evidence. According to Bobby, he believed Jennifer sold the property for $160,000 or $170,000, and he did not receive any money from the sale. Bobby testified that he filed this suit to be paid back the balance of the note that had not been paid and was still owed, plus attorney's fees that he believed Jennifer owed him.

Bobby acknowledged that on his payment log he had noted the monthly payments as they came in, that on July 11, 2013, November 13, 2013, and January 13, 2014, he noted "[n]o payment[,]" and that he made no more entries after March 12, 2014, because "she quit paying payments." Bobby testified that around

8

December 2015, after he had filed suit and almost eighteen months after Jennifer had made the last payment, he sent Jennifer a letter stating that he did not know that he was signing a release of lien, and he did not think he needed to read the papers because he believed he was signing "tax papers." The handwritten letter was admitted into evidence and in the letter, Bobby stated in pertinent part:

> You came to me & said dad you need to sign these papers so I can get the homestead tax. So believing in you & trusting in you, I didn't think I needed to read anything. So I signed the papers, I think [there were] 4 or 5. You had put the Release of Lien in the back, they were stap[led] together, they said sign here & here, not knowing I was signing a Release of Lien.

A page from the notary's book was admitted into evidence. Bobby testified that he was not saying that his signature was forged but that "[i]t just don't look right[]" because his signature looked different than every single other entry on the page in that it was squeezed into the bottom of the page where there is not really space for an entry and was made with a marker as opposed to a pen. Bobby testified that according to Jennifer's deposition she has sixteen to seventeen rental houses, he assumed that she probably did a lot of her closings at Hooks Title, and that the realtor that was at the title company was a friend of Jennifer's.

Bobby testified that the property in question—at 5 Idlewild—was on the same street as his house, he had to drive by the property to get to his house, he drove by the property often, and he never saw a "For Sale" sign and thought he would have seen it if there had been one. Bobby acknowledged that Jennifer and her husband

made some improvements to the property, but he testified they "didn't do a whole lot of work to it." Bobby testified that if Jennifer thought that he forgave the debt to give her an inheritance early, he "d[oes]n't know how she figured that." Bobby testified on direct examination that when the note first began Jennifer told him she could get insurance on the property at a lower cost with their business, so he cancelled the existing insurance. On cross-examination, Bobby acknowledged that he cancelled the insurance on March 21, 2014, the day after the release was signed, and that on the insurance cancellation form the reason for cancellation was filled in as "Sold home."

Testimony of Jennifer Parham

Jennifer Parham testified that her father bought the house at 5 Idlewild in May 2006, and he paid $10,000. She testified she moved into the house in August of 2006 and did not pay rent. According to Jennifer, the house was gutted after a tree fell through it during Hurricane Rita, and it was "barely livable[]" with "concrete floors. . . . no bathroom cabinets, no mo[u]lding, [and] studs in many of the rooms." Jennifer explained that she and her husband slowly worked on the house until it was finished and that they had to "do everything from the left side of the house -- from the living room to the left[]" because the "master bedroom, the kitchen, the master bath and part of the living room was completely totaled." According to Jennifer, she paid about $100,000 to improve the property. Jennifer testified they hired a contractor to

10

do the repairs and an estimate from the contractor was admitted into evidence showing a total projected cost of about $71,000 for repairs. Jennifer testified that in May 2013, they paid another contractor $32,000 and "added on a room and patio to the home -- an office and a patio, and then finished some other things to complete the home patio[,]" and the invoice for the addition was admitted into evidence.

Jennifer testified that in 2013 her brother "had come across some legal trouble[]" as a result of an altercation. Jennifer believed her father thought he would have to hire an attorney and that is why her father told her she either had to get out of the house or pay $75,000. Jennifer testified that she had no choice and she paid her father $10,000 and signed a promissory note for $65,000 on April 1, 2013, even though she did not feel she owed him $75,000. According to Jennifer, the house was in her father's name and he could kick her out of the house which she had paid over $100,000 to improve and leave her nothing if she did not agree to the arrangement.

Jennifer testified that in 2014, her father and his wife were having marital problems, he was hiding assets and money, and he "decided to sign the house over to [her] so it didn't get tied up in their divorce." Jennifer testified that she had made monthly payments for about a year, the release of lien was signed in March 2014, and her father told her that the forgiveness of the note was her inheritance. Jennifer testified that she was present at the title company when the documents were signed,

11

and her father and the notary were also present. Jennifer testified that the title company employee was "very clear[]" and

> [w]henever she laid out the release of lien, she said, Here's the release of lien he signed -- he signed the notary book. And then she laid out the new deed of trust. And she did say what each document was.
> I believe any time you go to a title company and you're signing documents, they always tell you what you're signing.

Jennifer acknowledged that she and her father did not discuss the forgiveness of the debt at the title company. Jennifer testified that the release of lien was the standard form that Hooks Title uses to release the lien and was not stamped "paid in full" or ripped up to show the debt was forgiven, she did not buy rent houses until 2016, this was her first home purchase and she assumed the release of lien released the promissory note. According to Jennifer, she was unaware of the legal requirements for forgiving a note that her father's counsel suggested—such as tearing up the note or stamping it "paid in full[,]"—and she had no reason to believe that her father was aware of those requirements at the time. Jennifer testified that if she had known that the way to release the note was to stamp the note "paid in full[,]" she would have done that. Jennifer testified that she knew the documents at the title company were not stapled together and the release of lien was not stapled to anything when it was shown to her father because she saw the title company employee put the documents down individually. She also had the originals in her possession and there were no staple marks on the documents.

According to Jennifer, for about a year after the release of lien was signed, her father never tried to collect a single payment or make a demand for payment. Jennifer testified that in April 2015, her brother and her husband's father had an altercation that left her father-in-law "on the side of the road in terrible shape[]" and hospitalized. Jennifer testified her father told her she needed to force her father-in-law to drop the charges against her brother because he was facing prison time, "or else. . . . I'm done with you." According to Jennifer, that is the last conversation she ever had with her father, and she put the house up for sale in May or June 2015 because her father lived down the street and she wanted to move. Jennifer testified that the house was on the market and listed with realtor Cathy Ferguson for about two months, and a "For Sale" sign was in the front yard during that time. According to Jennifer, the house sold for "[r]oughly[]" $160,000, and Jennifer agreed that other than the realtor fees and closing costs, the net proceeds from the sale went to Jennifer and her husband. Jennifer testified that after that, she received a demand letter from her father's attorney and then a handwritten letter from her father.

Testimony of Quentin Duff

Quentin Duff, Jennifer's common law husband and a master plumber who works in residential construction projects, testified that they moved into the house on Idlewild in 2006, and the home at the time was "condemned -- wasn't livable." According to Duff, the roof, rafters, and over half the house had been destroyed, and

13

the house was sitting being "rained in" for two years, so it was sold "for cheap[]" because "it was totaled out with the [prior owner's] insurance company." Duff testified that they gutted the house, blew insulation into the attic, did sheetrock work, installed new ceiling fans, added tile and wood floors, put in cabinets, tubs, and showers, and had contractors come in and redo some of the house with better materials when they had the money. Duff testified that he was able to do jobs for contractors and then, in return he would pay for materials and they would come do work at his house so he did not pay for all the labor on the house out of pocket. According to Duff, Bobby "has never been down there to swing a hammer[]" but Bobby bought a stove and refrigerator, and he had his wife's stepson do some sheetrock work. Duff testified that Bobby went with Jennifer and bought the tile because Duff was working, and then Duff paid Bobby back for the tile. Duff testified that over the years he tried to pay Bobby what Bobby had paid for the house and "he acted like, Oh, no big deal, I don't need it right now[.]"

With respect to the promissory note, Duff testified that Bobby called him and said he "need[ed] to get some money for that stuff on my house[,]" Duff told him "no problem[,]" Bobby responded, "I think it's about $100,000[,]" and Duff said, "Well, I think you're talking to the wrong person. You might want to give your daughter a call." According to Duff, after Jennifer talked to her father, she told Duff that she felt they did not have a choice and that they would have to pay or get out so

14

she made the payment arrangements with her father. Duff testified it was his understanding that Bobby hired an attorney for a divorce and Bobby was "wanting to hide stuff" with Jennifer and "at that point is when they were going to settle the release of lien." Duff testified that for a year and a half after they signed the release of lien, he never saw any letters or received any phone calls from Bobby about missed payments.

Testimony of Cathy Ferguson

Cathy Ferguson testified she is a licensed real estate broker, and she listed the house on Idlewild for Jennifer for "a couple of months, at least." According to Ferguson, she put a "For Sale" sign in the yard, and the sign would have been in the yard the whole time of the listing and until it sold. Ferguson testified that she was not involved in the release of lien but that when the property was sold, if there was any type of lien on the property, regardless of who the lienholder was, it would have come up during the title policy search, "even a few days in, on the title commitment[.]"

Standard of Review and Applicable Law

There are no findings of fact or conclusions of law included in the record, and the record does not reveal that either party requested any. When a bench trial is conducted and the court does not sign separate findings of fact and conclusions of law to support its judgment, all facts necessary to support the judgment are implied.

15

*See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987). The judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984). When the appellate record includes the reporter's and clerk's records, implied findings are not conclusive and may be challenged based on legal and factual sufficiency. *BMC Software Belg., N.V.*, 83 S.W.3d at 795. We review the trial court's decision for legal sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827.

When a party attacks the legal sufficiency of an adverse finding on which he did not have the burden of proof, he must demonstrate on appeal that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). But the factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony, and it is the province of the factfinder to resolve conflicts in the evidence. *City of Keller*, 168 S.W.3d at 819-20. If the evidence at trial would enable reasonable and fair-minded people to differ in

their conclusions, then the factfinder must be allowed to do so, and we may not substitute our judgment for that of the factfinder. *Id.* at 822.

When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We consider all the evidence, but we will not reverse the judgment unless "the evidence which supports the [] finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

This Court is not a factfinder. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). Instead the trier of fact—in this case the trial court—is the sole judge of witness credibility and the weight afforded the testimony. *GTE Mobilnet*, 61 S.W.3d at 615-16. "If we determine that the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary

17

evidence greatly outweighs the evidence in support of the challenged finding; we need not do so when we affirm." *Bennett*, 489 S.W.3d at 66.

"A release is subject to the rules of construction governing contracts, including the rules relating to ambiguity." *Naik v. Naik*, 438 S.W.3d 166, 174 (Tex. App.—Dallas 2014, no pet). To release a claim effectively, the releasing instrument must "mention" the claim to be released. *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 697-98 (Tex. 2000); *Naik*, 438 S.W.3d at 175; *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 885 (Tex. App.—Dallas 2014, pet. denied). However, it is not necessary for the parties to anticipate and explicitly identify every potential cause of action relating to the subject matter of the release. *See Keck, Mahin & Cate*, 20 S.W.3d at 698; *Naik*, 438 S.W.3d at 175; *McCullough*, 435 S.W.3d at 885. Rather, a valid release may encompass unknown claims and damages that develop in the future. *See McCullough*, 435 S.W.3d at 885. Further, although the "mention" requirement does not bar general, categorical releases, such releases are to be narrowly construed. *See Naik,* 438 S.W.3d at 175; *McCullough*, 435 S.W.3d at 885.

A contract is unambiguous if, as worded, it can be given a clear and definite legal meaning so that it can be construed as a matter of law. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589

(Tex. 1996) ("An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract."). A contract is ambiguous if it is subject to more than one reasonable interpretation after applying the relevant rules of construction. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006). "'Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.'" *Sacks v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (quoting *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589). Only where a contract is ambiguous may a court consider the parties' interpretation and "'admit extraneous evidence to determine the true meaning of the instrument.'" *See id.* at 450-51 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam)).

## Analysis

In issue one, Bobby argues that the trial court erred in failing to construe the unambiguous Release of Lien as merely a release of lien and not a release of the Note. In issue two, Bobby argues that, to the extent the release is ambiguous, the trial court erred in not construing the release against Jennifer as the drafting party, and erred in broadly construing the Release of Lien as a release of the Note. Here, the trial court entered a judgment and found "in favor of Defendant Jennifer Parham-namely that the alleged debt evidenced by the Note and the Promissory Note dated

19

April 1, 2013 were released by Plaintiff Bobby Parham." The trial court did not include any findings as to whether the promissory note was ambiguous.

On appeal, Bobby contends that the trial court erred in finding the note was released by the Release of Lien. But, we note that the trial court does not state in its judgment that the note was released "by the Release of Lien." Rather, the judgment finds in favor of Jennifer and merely states that the debt and note were released. According to Bobby, the promissory note signed by Jennifer was a negotiable instrument and governed by Section 3.604 of the Texas Business and Commerce Code[1] and Bobby contends that he held the original note, he had never marked it paid on the face of the note, and it was not destroyed or returned to Jennifer. The obligation of a party to pay a note may be discharged by an act or agreement with the party that would discharge an obligation to pay money under a simple contract. *See generally* Tex. Bus. & Com. Code Ann. § 3.601.

---

[1] Section 3.604 states, in relevant part:

(a) A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument:

(1) by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument, cancellation or striking out of the party's signature, or the addition of words to the instrument indicating discharge; or

(2) by agreeing not to sue or otherwise renouncing rights against the party by a signed record.

Tex. Bus. & Com. Code Ann. § 3.604.

On appeal, Bobby also argues the Release of Lien did not unambiguously and expressly release the Note. Bobby cites to *Zachry Construction Corp. v. Port of Houston Authority*, 449 S.W.3d 98, 118-19 (Tex. 2014), and *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 230-32 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). In *Zachry Construction*, Zachry Construction (Zachry) contracted with the Port of Houston Authority (the Port) to construct a wharf and Zachry agreed to complete the project in two years, and to pay daily liquidated damages for missing certain deadlines. 449 S.W.3d at 101-102. When negotiating a change order, the Port promised not to impose liquidated damages for delay under certain circumstances, but the Port did not put the promise in writing. *Id.* at 103. The Port ultimately withheld millions of dollars in liquidated damages from its payments to Zachry and Zachry completed the project more than two-and-one-half years after the contract deadline. *Id.* Zachry sued the Port for the withheld liquidated damages, as well as $30 million in damages from delays caused by the Port which the Port claimed were precluded under the contract. *Id.*

As to the delay damages withheld, the Port argued that Zachry's claim to the liquidated damages was precluded by the progress payment releases Zachry had executed to obtain periodic payments from which liquidated damages were withheld. *Id.* at 118-19. The releases Zachry signed were styled "Affidavit and Partial Release of Lien." *Id.* at 118. In the form language, Zachry acknowledged "partial payment

. . . on all sums owing" on a specified invoice and stated that it had "no further claims against [the Port] for the portion of the Work completed and listed on" the invoice. *Id.* at 118-19. Zachry disputed the Port's right to withhold liquidated damages when the Port first withheld the payments. *Id.* at 119. The purpose of a progress payment release is to ensure that the contractor will not accept payment for work performed and then insist on additional payment for that work. *Id.* The Supreme Court explained that the release plainly referred to claims for work completed, not for liquidated damages withheld for delays or work not completed, and that Zachry's releases could "no more be interpreted to extend to its claim for liquidated damages the Port withheld than to its claim for delay damages." *Id.* at 118-19.

We find the facts in *Zachry* measurably different from the facts in our case. In this bench trial, the trial court heard testimony from Jennifer, Jennifer's husband, and Jennifer's realtor that supported Jennifer's understanding that Bobby had released the debt and the lien. Additionally, the Release of Lien that Bobby executed expressly stated that the note had been paid, and it unequivocally released the lien on the property. And Bobby executed a General Warranty Deed and conveyed the property to Jennifer free and clear of all liens.

We also find the facts of *Lyda Swinerton Builders, Inc. v. Cathay Bank*, a lien priority case, to be inapposite to the facts in this case. In the *Cathay Bank* case, the

22

court of appeals concluded that there were fact issues relating to the scope of the builder's release of a previous mechanic's lien that could not be decided by summary judgment. 409 S.W.3d at 240-41. In the case at bar, the trial court denied Jennifer's Motion for Summary Judgment. And, then after conducting a bench trial, the trial court rendered judgment for Jennifer and noted in the judgment that the note and debt had been released.

Reviewing the evidence in the light most favorable to the judgment and indulging every reasonable inference that supports it, we conclude the trial court could have determined that the debt had been released by Bobby. The trial court could have concluded the language of the Release of Lien unambiguously released the lien and the Note. *See City of Keller*, 168 S.W.3d at 821-22, 827; *Graham Cent. Station*, 442 S.W.3d at 263. The Release of Lien stated that

> Holder of the Note acknowledges its payment and releases the property from the liens, together with all other liens and security interests held by the Holder without regard to how they were created. Holder further expressly releases any rights to establish or enforce the liens with regard to any other indebtedness.

The trial court could have concluded the language of the release was broad enough to cover the Note because the Note was specifically mentioned in the Release of Lien and could have also been generally included with the "other indebtedness" released. After indulging every reasonable inference that supports the judgment, we conclude

that the trial court could have determined that Bobby intended to forgive the unpaid portion of the alleged debt. *See City of Keller*, 168 S.W.3d at 822.

The trial court heard testimony that the release documents were presented separately for Bobby to review and sign and that Bobby canceled the insurance on the property the day after he signed the Release of Lien. The trial court heard testimony that Bobby was having marital problems and may have been attempting to conceal assets to prepare for a potential divorce. The trial court had evidence in the record of Bobby's handwritten payment log wherein no further notations of non-payment by Jennifer were noted after the execution of the Release of Lien. The trial court heard testimony that Bobby had to pass the property to get to his home on the same street, that the realtor displayed a "For Sale" sign in the front yard for at least forty-five days, and that he did not demand payment on the Note until after the house sold and after a family dispute later arose. The trial court also heard Jennifer testify that she believed the remainder due on the note was forgiven by Bobby as part of her "inheritance." And, the trial court heard testimony from Jennifer that she had made monthly payments on the note until the time when Bobby executed the Release of Lien and General Warranty Deed. The trial court as fact finder was the sole trier of fact and weigher of any conflicting evidence, and even if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, we may not substitute our judgment for that of the fact finder. *See id*. We find that some

24

evidence supports the trial court's take-nothing judgment and finding that Bobby released the debt, and we conclude that the judgment is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Bennett*, 489 S.W.3d at 66. We overrule Bobby's appellate issues and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 21, 2020
Opinion Delivered November 19, 2020

Before McKeithen, C.J., Horton, and Johnson, JJ.